1   WO

2

3

4

5                 IN THE UNITED STATES DISTRICT COURT

6                   FOR THE DISTRICT OF ARIZONA

7

8   VERN HAMMOND,                    )
                                     )
9           Plaintiff,               )
                                     )
10         v.                        )      CIV 07-00264 PHX MEA
                                     )
11  MICHAEL ASTRUE,                  )      MEMORANDUM & ORDER
    Commissioner of                  )
12  Social Security,                 )
                                     )
13          Defendant.               )
    _____ )

14          The parties have consented to have all proceedings in

15  this case conducted before a United States Magistrate Judge

16  pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of

17  Civil Procedure.

18          Plaintiff, Mr. Vern Hammond, who is represented by

19  counsel, brought this action pursuant to 42 U.S.C. §§ 405(g) and

20  1383(c)(3), seeking judicial review of the final decision of the

21  Commissioner of the Social Security Administration, Defendant

22  Michael Astrue (the "Commissioner"), denying Plaintiff's claim

23  for disability insurance benefits pursuant to Title II of the

24  Social Security Act, codified at 42 U.S.C. §§ 401-433, and

25  Plaintiff's application for Supplemental Security Income

26  benefits pursuant to Title XVI of the Social Security Act, 42

27  U.S.C. § § 1381-1383f.

28          I  Procedural History

            Plaintiff was previously granted Title II and Title XVI

disability benefits pursuant to an application filed in December 1987 and approved on August 26, 1988. Administrative Record on Appeal ("R.") (Docket No. 9) at 68. In April of 1995 Plaintiff's benefits were discontinued due to his substantial gainful activity following a successful Trial Work Period. Id. at 69-70 & 613.

Plaintiff filed an application for disability insurance benefits and Supplemental Security Income ("SSI") benefits in April and May of 2001, alleging an onset of disability as of April 25, 2001. Id. at 120-23 & 448-51. Plaintiff's applications for benefits were denied initially and on appeal. Id. at 82-85 & 447. Plaintiff requested a hearing regarding his eligibility for benefits, which was conducted before an Administrative Law Judge ("ALJ") on September 3, 2002. Id. at 30-64. The ALJ found Plaintiff not disabled and denied benefits. Id. at 15-26.

Plaintiff sought review of this decision by the Social Security Appeals Council, which denied review on February 7, 2003. Id. at 11-12. The denial of review rendered the ALJ's decision the final decision of Defendant, the Commissioner of the Social Security Administration, for purposes of judicial review. See 20 C.F.R. § 404.981 (2007).

Plaintiff filed an action seeking review of the Commissioner's decision in the United States District Court for the District of Arizona on March 3, 2003. See Docket No. CV 03-00407 PHX MS. On June 28, 2003, the parties in that matter stipulated to a remand of the claims and on July 7, 2003, the Court ordered Plaintiff's claim be remanded to the Commissioner.

In the interim, in February and April of 2003, Plaintiff filed applications for SSI and disability insurance benefits, alleging an onset of the inability to work as of October 22, 2002.  R. at 798-91.   These applications, alleging disability based on psoriatic arthritis and resulting pain, were consolidated with the applications filed in 2001.  Id. at 613.

On October 3, 2003, pursuant to the stipulation of the parties in the United States District Court for the District of Arizona matter, Plaintiff's applications for benefits were remanded by the Commissioner to the ALJ.  Id. at 510-15. Another hearing was conducted before an ALJ on January 13, 2004. Id. at 489-509. On February 10, 2004, the ALJ issued a decision finding Plaintiff not disabled and denying benefits.  Id. at 476-88.  Plaintiff sought review of this decision by the Appeals Council, which denied review on November 8, 2004.  Id. at 466-68.

Plaintiff filed an action in the United States District Court for the District of Arizona on November 23, 2004.  See Docket No. CV 04-2704 PHX MS.   The parties in that matter stipulated to a remand of the claims and on May 6, 2005, the Court ordered Plaintiff's applications for benefits be remanded to the Commissioner.  On June 1, 2005, the Appeals Council again remanded Plaintiff's case to the ALJ.  Id. at 1008-10.

Another hearing was conducted before a different ALJ on February 27, 2006.  Id. at 1011-50.  On May 31, 2006, that ALJ issued a decision finding Plaintiff not disabled and denying benefits.   Id. at 609-25. Plaintiff sought review of this decision by the Appeals Council, which denied review.  Id. at

591-95.

Plaintiff filed this action for judicial review of the Commissioner's decision denying him Social Security disability benefits and SSI benefits on January 31, 2007. Plaintiff alleges, with regard to the May 2006 decision, that the ALJ erred in his findings of fact and application of the law when concluding Plaintiff was not disabled as that term is defined by the Social Security statutes.

## II  Standard of review

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), the Court's jurisdiction extends to reviewing the final decision of Defendant denying Plaintiff's application for Social Security disability benefits and Supplemental Security Income benefits. Plaintiff and Defendant have filed motions seeking judgment as a matter of law. See Docket No. 10 & Docket No. 19.

Judicial review of a decision of the Commissioner is based upon the pleadings and the record of the contested decision. See 42 U.S.C. § 405(g) (2003 & Supp. 2007). The scope of the Court's review is limited to determining whether the Commissioner, i.e., the ALJ, applied the correct legal standards to Plaintiff's claims for benefits and whether the record as a whole contains substantial evidence to support the ALJ's findings of fact. See id. § 423; Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005); Bustamante v. Massanari, 262 F.3d 949, 953 (9th Cir. 2001). However, if an ALJ's legal error was harmless, i.e., there is substantial evidence in the record to support the ALJ's conclusion on the challenged issue absent the legal error, the case need not be remanded for further

-4-

proceedings.   See Batson v. Commissioner of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004); Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990); Booz v. Secretary of Health & Human Servs., 734 F.2d 1378, 1380 (9th Cir. 1984).[1]   But see Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997) (rejecting a harmless error rule).

Satisfying the substantial evidence standard requires more than a mere scintilla but less than a preponderance of evidence. See, e.g., Bustamante, 262 F.3d at 953. Substantial evidence has been defined as the amount of relevant evidence a reasonable mind would accept as adequate to support a conclusion. See, e.g., Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006); Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999).

Evidence is insubstantial if it is overwhelmingly contradicted by other evidence in the administrative record. See Threet v. Barnhart, 353 F.3d 1185, 1189 (10th Cir. 2003);

---

[1] The Ninth Circuit Court of Appeals has stated an error is harmless if it does not "materially impact" the ultimate disability determination or if the error is not prejudicial to the claimant, including when the error is made at a step of the sequential process the ALJ was not required to take. See, e.g., Robbins v. Social Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (stating: "we have only found harmless error when it was clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination,'" and holding an "ALJ's silent disregard of lay testimony about how an impairment limits a claimant's ability to work" was not harmless error); Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1055-56 (9th Cir. 2006). Even when part of an ALJ's five-step analysis is not linguistically completely clear or exhaustively complete, or precisely factually accurate, some errors are legally harmless, such as errors which do not affect the ultimate result of the analysis. See Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007), cert. denied, 76 U.S.L.W. 3169 (Jan. 18, 2008); Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990); Booz v. Secretary of Health & Human Servs., 734 F.2d 1378, 1380 (9th Cir. 1984).

Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983); Robison v. Barnhart, 316 F. Supp. 2d 156, 163 (D. Del. 2004); Rodriquez v. Barnhart, 252 F. Supp. 2d 329, 332 (N.D. Tex. 2003); Rieder v. Apfel, 115 F. Supp. 2d 496, 501 (M.D. Pa. 2000).   If the evidence with regard to a particular issue is in equipoise, the Court must affirm the decision of the ALJ on that issue.   See, e.g., Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005); Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Gwathney v. Chater, 104 F. 3d 1043, 1045 (8th Cir. 1997); Books v. Chater, 91 F. 3d 972, 977-78 (7th Cir. 1996).   Additionally, "[w]hile inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice."   Widmark, 454 F.3d at 1066, quoting Batson, 359 F.3d at 1193.

Because the ALJ is responsible for weighing the evidence, resolving conflicts, and making independent findings of fact, the Court may not decide the facts anew, re-weigh the evidence, and decide whether a claimant is or is not disabled. See, e.g., Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001); Powers v. Apfel, 207 F.3d 431, 434-35 (7th Cir. 2000).   The Ninth Circuit Court of Appeals recently re-emphasized that an ALJ's ultimate decision regarding disability should be upheld by the Court if the record evidence before the ALJ, taken as a whole, is susceptible to more than one "rational" interpretation.   Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007).   See also Bustamante, 262 F.3d at 953 (holding that, if the evidence is in equipoise, the decision of the ALJ must be affirmed).   The Court is to review only the reasons provided by

1   the ALJ in their disability determination, and may not affirm

2   the ALJ on a ground upon which he did not rely.  <u>See</u> <u>Orn</u> 495

3   F.3d at 625; <u>Connett v. Barnhart</u>, 340 F.3d 871, 874 (9th Cir.

4   2003).

5                 **III  Statement of the law**

6             The federal government provides disability
benefits under two programs administered by

7             the SSA. []. Title II (SSDI) of the Social
Security Act ("Act"), 42 U.S.C. §§401 *et*

8             *seq.,* provides benefits to persons with
mental or physical disabilities, and Title

9             XVI (SSI) of the Act, 42 U.S.C. § 1381 *et*
*seq.,* provides benefits to indigent persons

10            with disabilities.

11 <u>Kildare v. Saenz</u>, 325 F.3d 1078, 1080 (9th Cir. 2003).  The

12 statutory definitions of disability and the regulations

13 promulgated by the Social Security Administration for

14 determining disability, governing these two programs are, in all

15 aspects relevant to the matter before the Court, substantively

16 identical.  <u>See</u>, <u>e.g.</u>, <u>Mickles v. Shalala</u>, 29 F.3d 918, 924 n.2

17 (4th Cir. 1994).  Federal regulations prescribe the same five-

18 step "sequential evaluation" for making the SSI disability

19 determination as for a determination pursuant to Title II.  <u>See</u>

20 20 C.F.R. §§ 404.1520, 416.920 (2007); <u>Bowen v, City of New</u>

21 <u>York</u>, 476 U.S. 467, 470, 106 S. Ct. 2022, 2025 (1986).[2]

22       To establish eligibility for disability benefits under

23 the Social Security Act, the claimant must show: (1) he suffers

24 from a medically determinable physical or mental impairment

25   ————————————————

26       [2] The primary difference between the two benefits programs is
that, to be eligible for Title II disability benefits, the claimant

27 must demonstrate they were "disabled" on or before the date they are
or were "last insured" for these benefits.  <u>See</u>, <u>e.g.</u>, <u>McCartey v.</u>

28 <u>Massanari</u>, 298 F.3d 1072, 1077 n.7 (9th Cir. 2002); <u>Ball v. Massanari</u>,
254 F.3d 817, 819 (9th Cir. 2001).

which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months, see 42 U.S.C. § 423(d)(1)(A)(2003 & Supp. 2007); and (2) the impairment renders the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment existing in the national economy. See id. § 423(d)(2)(A). If a claimant meets both of these requirements, he is by definition "disabled." See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

The Social Security Administration regulations prescribe a five-step sequential process for determining whether a claimant is "disabled." See 20 C.F.R. § 404.1520 (2007). The burden of proof is on the claimant throughout steps one through four. See Tackett, 180 F.3d at 1098. If a claimant is found to be "disabled" or "not disabled" at any step in the sequential process, there is no need to proceed to the subsequent step(s). See id.

First, the claimant must establish he is not gainfully employed at the time of his application. See 20 C.F.R. § 404.1520(a)(4)(i) (2007). Next, the claimant must be suffering from a "medically severe" impairment or "combination of impairments." Id. § 404.1520(a)(4)(ii).[3] The third step is to

---

[3] Impairments that can be controlled effectively with medication are not disabling and do not support a finding of total disability for the purpose of determining eligibility for SSI benefits. See, e.g., Warre v. Commissioner of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006); Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987); Maddox v. Massanari, 199 F. Supp. 2d 928, 942 (E.D. Mo. 2001). See also Odle v. Heckler, 707 F.2d 439, 440 (9th Cir. 1983) (affirming a denial of

determine whether the claimant's impairment meets or equals one of the "listed" impairments included in Appendix 1 to this section of the Code of Federal Regulations.  See id. § 404.1520(a)(4)(iii).  If the claimant's impairments meet or equal one of the impairments listed in Appendix 1, the claimant is conclusively "disabled."  See id.

The fourth step of the process requires the ALJ to determine whether the claimant, despite his impairment, can perform work similar to work he has performed in the past.  A claimant whose "residual functional capacity" allows him to perform "past relevant work" despite his impairments, will be denied benefits.  See id. § 404.1520(a)(4)(iv).  If the claimant cannot perform his past relevant work, at step five the burden shifts to the Commissioner to demonstrate the claimant can perform other substantial gainful work that exists in the national economy, given his residual functional capacity.  See id. § 404.1520(a)(4)(v); Tackett, 180 F.3d at 1098.

### IV   Statement of Facts

Plaintiff was born in 1963.  R. at 121.  Plaintiff received disability benefits effective July 1987 until March of 1995.  The applications for disability and SSI benefits under review in this matter assert Plaintiff again became disabled in April of 2001.

Plaintiff injured his lower back in a work-related

benefits and noting that the claimant's impairments were responsive to medication).

accident in July of 1987.  Id. at 226.  Plaintiff developed severe low back pain, a rash, problems with his toenails and fingernails, and tenderness and swelling of his feet.  Id. at 228-29 In August of 1987 Plaintiff was diagnosed as suffering from Reiter's syndrome[4] and a disc bulge at his L5-S1 vertebrae without nerve root impingement.  Id. at 277-78.

In December of 1987 a treating physician opined Plaintiff suffered from "B-27 positive spondyloarthropathics" (as possessing a type of tissue predisposed to diseases such as Reiters and spondyloarthropathies).  Id. at 228-42.  In 1988 a treating physician opined Plaintiff would be unable to return to his "physical labor type employment" due to persistent swelling, tenderness, and redness in several of the small joints of his hands in addition to his wrists and toes.  Id. at 243.

In September 1988 Plaintiff was granted disability benefits at the reconsideration level, effective as of July 1987, based on "B 27 spondylarthropathy" and "Reiter's syndrome."  Id. at 67-68.  Plaintiff started working again in 1994 or 1995, and when his wages exceeded the permissible amount he became ineligible for disability benefits and his disability entitlement was ordered ceased, at the initial and reconsideration levels, effective April 1995.  Id. at 69-70.

In 1994, Plaintiff was treated for chronic plaque psoriasis.  Id. at 270.  In January of 1995, Plaintiff underwent surgery on his feet for extensive musculoskeletal deformities

_____

[4] A disorder commonly resulting in arthritis, redness of the eyes, and urinary tract symptoms.  Reiter's has been referred to as "reactive arthritis."

1   arising as a result of  psoriatic arthritis.   Id. at 252-59.

2          In 1999, Plaintiff was working as an electrician.   Id.
3   at 345.   Plaintiff lacerated a finger on his left hand.   Id.

4          In 2000, Plaintiff reported increasing problems with
5   his psoriasis and reported he was having breathing problems.
6   Id. at 370.   In July of 2000, Plaintiff was referred to Dr. Chun
7   for treatment of severe pain in his left finger.   Id. at 362.
8   X-rays indicated erosive bony changes consistent with psoriatic
9   arthritis.   Id. at 362-64.

10          In August of 2000, Plaintiff was seen by Dr. Stone, a
11   podiatric specialist.   Id. at 357.   Plaintiff reported some
12   relief from his orthotics, but stated that his right foot hurt
13   with walking and standing.   Id.   The doctor noted Plaintiff's
14   foot joints dislocated with pressure.   Id.

15          In September of 2000, due to Plaintiff's prognosis of
16   progressive deformity resulting in further reconstructive
17   surgery, Dr. Stone opined Plaintiff might need to consider
18   disability or job retraining.   Id. at 356.   In September of 2000
19   Plaintiff underwent surgery for his left finger.   Id. at 353-54.
20   In October of 2000 Dr. Stone noted Plaintiff had severe joint
21   deformities.   Id. at 348.   In November of 2000 Dr. Stone's notes
22   indicate Plaintiff was deferring physical therapy because his
23   work hours had been reduced and he had lost his medical
24   benefits.   Id. at 338.

25          In March of 2001 Dr. Stone opined Plaintiff was
26   "markedly disabled" by his psoriatic arthritis.   Id. at 326.
27   Dr. Stone noted it was very difficult for Plaintiff to ambulate.
28   Id.   The doctor recommended surgery resulting in six to twelve

weeks of Plaintiff being unable to bear weight on his right foot.  Id.  Dr. Stone recorded: "Long-term need consideration for disability and possible vocational rehab."  Id.

In April of 2001 an examination by Dr. Carpenter, Plaintiff's treating physician, revealed arthritic changes in Plaintiff's left finger, right elbow and shoulder, and feet.  Id. at 322-23.  Dr. Carpenter noted that Plaintiff's psoriasis appeared to be better controlled by methotrexate, although Plaintiff still had significant plaques despite his use of corticosteroids.  Id. at 323.  Dr. Carpenter also noted "No mood swings or depression."  Id.

At that time, despite the presence of large plaques on Plaintiff's torso and other parts of his body, Dr. Carpenter stated Plaintiff's associated diagnoses, psoriatic arthritis, psoriasis and asthma, were inactive.  Id.  Dr. Carpenter also noted "Patient will pursuing vocational rehabilitation and has applied for disability though he recognizes likely able to do a sedentary or light work (sic)."  Id.

Plaintiff had surgery on both feet on April 25, 2001. Plaintiff had revisional-type surgery on his right foot and reconstructive-type surgery on his right forefoot, performed by Dr. Stone.  Id. at 311-14 & 317-18.  Plaintiff's toes were resectioned, wired and screwed together, and the bones of his foot were screwed together.  Id. at 311-14.

Plaintiff filed his application for disability insurance benefits on May 21, 2001.  Id. at 121 & 189-92. Plaintiff's 2001 application for benefits asserts he is unable to work due to psoriatic arthritis, pain and joint damage to his

left hand, back, neck, hip, right elbow, knees and feet, and depression. Id. at 178-87. Plaintiff has a bachelor's degree in wildlife management from North Dakota State University, which he obtained in 1994. Id. at 35, 143-46. A Work History Report filed in 2001 indicates Plaintiff worked for three months in 1994 as a biological technician, and that Plaintiff worked for approximately three years, from 1994 through 1997, as a plumbing and excavating heavy-equipment operator. Id. at 195. Plaintiff worked from 1997 through 2000 as an electrician, for a few months in 2000 as a janitor, and for approximately one year, from April of 2000 through April of 2001, as a delivery driver. Id.[5]

In June of 2001, Plaintiff's hearing was evaluated. Id. at 303. Plaintiff had severe high frequency hearing loss in the right ear and moderate high frequency hearing loss in his left ear and a hearing aid was recommended. Id.

In July of 2001, Dr. Stone found Plaintiff to be "essentially asymptomatic," with only "occasional discomfort" in his sub-fourth and fifth metatarsal region, which the doctor attributed to scar tissue. Id. at 296. The doctor noted Plaintiff's edema was diminishing and that "arthrodesis" was complete as viewed on x-ray. Id.

Plaintiff's application for SSI disability benefits was denied on July 25, 2001. Id. at 447.

In August 2001, Dr. Stone adjusted Plaintiff's orthotic

---

[5] Plaintiff's earnings report indicates minimal earnings in 1983-1986. The earnings report indicates Plaintiff earned $12,363 in 1994, approximately $18,444 in 1995, $20,570 in 1996, $4,486 in 1997, $22,343 in 1998, $13,968 in 2000, and $4,725 in 2002. R. at 125-26.

for his forefoot extension.  Id. at 295.  In September 2001, Dr.
Stone noted Plaintiff was progressing favorably, and adjusted
Plaintiff's orthotic.  Id. at 292.  The doctor stated Plaintiff
was to be followed as needed for adjustments to his orthotic.
Id.

      In October 2001 an X-ray of Plaintiff's lumbar spine
revealed a marked decrease in the disc space at Plaintiff's
T11-12 vertebrae.  Id. at 288.  The reviewing physician noted
the X-ray was otherwise normal.  Id.  Additional imaging of
Plaintiff's lumbar spine revealed degenerative changes and left
sacroilitis.  Id. at 290-91.  At that time, Dr. Carpenter
opined Plaintiff suffered from psoriatic arthritis and
oligoarthritis, with disability in the feet.  Id. at 289.  Dr.
Carpenter also stated Plaintiff suffered from degenerative
thoracolumbar disk disease with no evidence of radiculopathy.
Id.  Dr. Carpenter stated Plaintiff's psoriasis appeared to be
controlled.  Id.

      Dr. Carpenter noted he had a long discussion with
Plaintiff about disability in October of 2001.  Id.  Dr.
Carpenter agreed Plaintiff could not do any prolonged standing
and that Plaintiff was perhaps incapable of uninterrupted
sitting.  Id.  Dr. Carpenter stated that, with a "proper degree
of autonomy regarding movement, sedentary and light levels of
work could likely be accomplished. ..."  Id.  Dr. Carpenter
noted Plaintiff stated he would pursue vocational rehabilitation
and continue his current therapy.  Id.

      In December of 2001 Plaintiff's application for SSI
disability benefits was denied upon reconsideration.  Id. at

-14-

456-58.

On May 1, 2002, Plaintiff was initially examined by rheumatologist Carolyn Pace. Id. at 425-27. Plaintiff reported significant pain in his neck, with increasing limitation in the range of motion of his cervical spine. Id. at 425. Plaintiff also averred he had significant pain in his left hand, both feet and ankles, and his right shoulder. Id. Plaintiff described his pain as "9-1/2" out of "10" and said his medication did not relieve his pain. Id. Plaintiff also stated he experienced continuing depression, despite the fact that he was taking Celexa. Id.

Dr. Pace's examination revealed Plaintiff had multiple tender points, which she found consistent with fibromyalgia. Id. at 426. Dr. Pace opined Plaintiff had psoriatic arthritis with "what sounds like spondylorarthropathy associated with it..." Id. Dr. Pace prescribed methotrexate for Plaintiff's psoriatic arthritis and spondylorarthropathy. Id. at 426. She also assessed Plaintiff as suffering from fibromyalgia with secondary depression, and prescribed a "Duragesic" patch and compazine for these problems. Id. Dr. Pace opined Plaintiff would do well on "Remicade" therapy, however, Plaintiff's insurance would not approve that medication. Id. at 426 & 429.

On May 17, 2002, Dr. Pace noted Plaintiff was "significantly better" as a result of the Duragesic therapy and that Plaintiff had been taking only one to two Vicodin per day, reporting that his pain level was down to "two to three." Id. at 428. Dr. Pace opined Plaintiff had cervical radiculopathy Id. At that time, Dr. Pace decreased Plaintiff's prednisone

-15-

treatment for psoriatic arthritis.  Id.

On July 1, 2002, Plaintiff told Dr. Pace he was developing the "cold sweats" as a side-effect of taking Celexa. Id. at 429.  Accordingly, Dr. Pace switched Plaintiff's depression medication from Celexa to Paxil.  Id.  Plaintiff asked if his Duragesic could be increased.  Id.  Because Remicade was disallowed by Plaintiff's insurance, he was placed on the waiting list for Enbrel.  Id.  At that time, Plaintiff reported his psoriasis had increased slightly since his prednisone had been decreased.  Id.  Dr. Pace opined Plaintiff would benefit from acupuncture treatments, and she also prescribed sulfasalazine in addition to continuing the Duragesic patch.  Id.

On July 10, 2002, Dr. Pace completed a form entitled "Arthritis Residual Functional Capacity Questionnaire."  Id. at 380-86 ("Exhibit 10F").  Dr. Pace diagnosed Plaintiff as suffering from psoriatic arthritis, and she opined his prognosis as "fair-poor."  Id. at 380.  Dr. Pace noted Plaintiff's reduced range of motion in his first, second, and fifth left-hand digits, and that he had diminished mobility of his shoulders and feet.  Id.  Dr. Pace indicated Plaintiff had reduced grip strength.  Id. at 380-81.

The doctor indicated Plaintiff was not a malingerer and that emotional factors did contribute to the severity of Plaintiff's symptoms and functional limitations.  Id. at 381. Dr. Pace opined that Plaintiff's experience of pain was "constantly" severe enough to interfere with his attention and concentration.  Id.  Dr. Pace indicated Plaintiff experienced

-16-

1   depression and "anxiety as psychological conditions affecting
2   pain." <u>Id.</u>  She also opined Plaintiff was incapable of "low
3   stress jobs," because "stress is a known aggravating factor of
4   arthritis." <u>Id.</u> at 381-82.

5   With regard to Plaintiff's medications, Dr. Pace stated
6   Plaintiff experienced side effects from Duragesic and Celexa,
7   including chest pains. <u>Id.</u> at 382.  Dr. Pace assessed Plaintiff
8   as able to continuously sit for a period of 20 minutes, stand
9   for a period of 15 minutes, and she wrote he "cannot do [8 hour
10  working day] with normal breaks." <u>Id.</u>  The doctor opined
11  Plaintiff needed to be able to sit and stand at will and that he
12  needed to take unscheduled breaks every 15-20 minutes, resting
13  at least a half-hour either lying down or with his legs elevated
14  at least 30 degrees before returning to work. <u>Id.</u> at 383-84.
15  She further opined Plaintiff's legs should be elevated at least
16  50 percent of the day, although he did not need an assistive
17  device while engaged in occasional standing or walking. <u>Id.</u> at
18  384.

19  Dr. Pace repeatedly stated Plaintiff could not work
20  eight-hour shifts. <u>Id.</u> at 383-84.  Dr. Pace opined Plaintiff
21  could never lift or carry 10 pounds. <u>Id.</u> at 384.  The doctor
22  declared Plaintiff had significant limitations in doing
23  repetitive reaching, handling or fingering, with the ability to
24  use his right hand only 5 percent of an 8-hour workday to grasp,
25  turn, twist objects repetitively or for repetitive fine
26  manipulations.  Dr. Pace also concluded Plaintiff could not use
27  his right arm for reaching. <u>Id.</u> at 385.  The doctor assessed
28  Plaintiff as incapable of using his left hand and that he was

precluded from stooping.  Id.  She further predicted Plaintiff would have "good days" and "bad days," with "bad days" likely occurring more than four times a month.  Id.

On July 10, 2002, Dr. Carpenter completed a "Physical Residual Functional Capacity Questionnaire"  Id. at 400-06 ("Exhibit 13F").   Dr. Carpenter stated he last examined Plaintiff on October 9, 2001.  Id. at 400.  Dr. Carpenter diagnosed Plaintiff with psoriatic arthritis involving his hands, feet, and back, stating that Plaintiff also listed depression as a result of his psoriatic spondyloarthropathy. Id.  The doctor reported that Plaintiff felt incapable of even low stress jobs because of difficulty with concentration, although Dr. Carpenter also stated he did not know if Plaintiff had attempted a low stress job.  Id. at 400-02. Dr. Carpenter disclosed Plaintiff felt he was definitely unable to stand for any prolonged period of time, i.e., more than about 15 to 20 minutes at a time.  Id. at 403.  The doctor opined Plaintiff could use only the third and fourth fingers of his left hand. Id. at 400, 403.

Dr. Carpenter indicated Plaintiff was not a malingerer and that emotional conditions, i.e., depression and anxiety, contributed to his physical condition.  Id. at 402. Dr. Carpenter believed Plaintiff's pain was constantly severe enough to interfere with his concentration and attention.  Id.  The doctor deferred an answer to the question, "To what degree can your patient tolerate work stress?" by checking the box "Incapable of even 'low stress' jobs," and then noting on the form: "patient determination."  Id.  The doctor wrote: "patient

-18-

unable to cope with stress though I do not know if he has attempted a 'low stress' sedentary job ...' Id.

Specifically, Dr. Carpenter concluded Plaintiff was capable of walking one city block, standing 15-20 minutes at a time and sitting less than two hours at a time. Id. at 403. Dr. Carpenter opined Plaintiff would need a job permitting sitting, standing, and shifting positions at will, however, he also stated Plaintiff's legs did not have to be elevated during a workday. Id. at 403-04. Dr. Carpenter commented that Plaintiff "feels unable to do" an eight-hour workday. Id. at 404. The doctor stated Plaintiff was precluded from lifting and carrying 10 pounds and that Plaintiff could only minimally use his right hand for repetitive grasping, turning, and twisting, his right fingers for fine manipulation, and his right arm for reaching. Id. at 405. Dr. Carpenter opined Plaintiff was completely unable to do any repetitive activities with his left hand, fingers, or arm. Id. Dr. Carpenter believed Plaintiff would have "good" and "bad" days, and his impairments would likely cause him to miss work four or more days per month. Id.

Dr. Stone, Plaintiff's treating podiatrist and surgeon, completed a "Certification of Physician or Practitioner" and "Physical Residual Functional Capacity Questionnaire" on July 9, 2002. Id. at 407-14 ("Exhibit 14F" and "Exhibit 15F"). He stated Plaintiff had severe osseous deformities of the feet requiring multiple surgeries and reconstructive foot surgery. Id. at 407, 409. Dr. Stone "would not recommend work duty that requires walking, standing, lifting due to deformity," and opined this incapacity was permanent. Id. at 407, 409. The

1  number of absences from work needed by Plaintiff would depend on
2  individual circumstances, Dr. Stone believed, and he deferred to
3  the rheumatologist regarding Plaintiff's general continuing
4  treatment for pain.  Id. at 407-08.

5          Dr. Stone opined that "vocational rehab. would be
6  reasonable" but [that] Plaintiff would not be able to perform
7  prolonged walking, standing or lifting."  Id. at 408.  The
8  doctor circled "often" and "frequently" with regard to whether
9  Plaintiff's pain was severe and persistent enough to interfere
10 with his attention and concentration.  Id. at 410.  Dr. Stone
11 put question marks in the blanks for the questions regarding
12 Plaintiff's ability to perform "low stress jobs," writing that
13 it "depends work related physical or mental stress that results
14 in physical stress."  Id.

15         Dr. Stone concluded Plaintiff could walk one city
16 block, stand for 10 minutes at a time, and stand or walk for two
17 hours in an eight-hour workday.  Id. at 411. Dr. Stone noted
18 Plaintiff would have to rest "20-30" before returning to work,
19 and opined Plaintiff could occasionally lift and carry less than
20 10 pounds.  Id. at 412.   Dr. Stone stated that Plaintiff's
21 impairments would likely produce "good" and "bad" days, and that
22 Plaintiff's impairments would cause him to miss work about once
23 per month.  Id. at 413.

24         On September 4, 2002, Plaintiff was treated by
25 orthopedist Gustavo J. Armendariz.  Id. at 438-39.  Plaintiff
26 reported pain and difficulty walking since his surgery of April
27 2001, and presented with two different sets of orthotics.  Id.
28 at 438.  After examining Plaintiff, Dr. Armendariz's impression

was patello-femoral pain and forefoot pain, resulting from his status as post multiple surgical procedures.  Id. at 439. Dr. Armendariz opined Plaintiff had "well exhausted surgical management of his foot" and that further surgery would not be of benefit to Plaintiff.  Id.  The doctor thought Plaintiff's ability to bear weight on his forefoot would always be limited. Id.  Dr. Armendariz prescribed shoe modifications and orthotic modifications.  Id.  Dr. Armendariz concluded Plaintiff's knee pain was not explained by the normal MRI, but that it might be caused by his abnormal gait.  Id.  Dr. Armendariz believed the knee pain might respond to physical therapy.  Id.

Dr. Armendariz stated that, with regard to Plaintiff's specific limitations, Plaintiff would be limited in his ability to stand and walk and he could not climb ladders and walk on uneven surfaces.  Id.  Dr. Armendariz opined Plaintiff would need a job where most of his work could be done in a sedentary status.  Id.

On September 10, 2002, still rating his pain at "four" out of "ten," Plaintiff received his first Remicade therapy treatment.  Id. at 544.  Plaintiff was still using a Duragesic patch for pain, but he asked to decrease the dosage because the then-current amount made him groggy.  Id.

The ALJ denied Plaintiff's applications for disability insurance and SSI disability benefits in a written decision dated October 21, 2002.

On October 22, 2002, Plaintiff had his third Remicade treatment.  Id. at 543.  The doctor's notes from that date state: "The patient states he is doing extremely well.  He had

-21-

his 3rd infusion and states it is miraculous.  He has his sense of humor back and is not depressed.  He can't believe the psoriasis disappeared. ... overall he is doing much better." Id.  Dr. Pace assessed Plaintiff as remaining disabled and recommended he continue on the same medications with the addition of Imuran and that his liver function be watched.  Id.

On November 27, 2002, Plaintiff reported he was having some pain relief with Remicade and that, overall, his pain was was "significantly improved."  Id. at 541.  Plaintiff had recently been diagnosed with diabetes and for that he was treated with Glucophage.  Id.  Plaintiff's liver function tests continued to be slightly elevated from the normal range and Dr. Pace noted the Imuran might have to be discontinued eventually and replaced by sulfasalazine, to prevent rejection of the Remicade.  Id.

On December 17, 2002, Plaintiff reported being a little more "achy" than usual and he rated his pain as "two-three" out of "ten."  Id. at 540.  Dr. Pace assessed Plaintiff as "still disabled, however, doing significantly better on Remicade and appropriate narcotic and analgesics; ... Depression better on Celexa."  Id. at 540.

On January 29, 2003, Plaintiff reported increasing pain in his neck and lower back and he rated his overall pain at "four" out of "ten."  Id. at 539.  Dr. Pace noted Plaintiff was more animated than previously.  Id.  The doctor noted "significant improvement" in Plaintiff's psoriatic arthritis symptoms as a result of the Remicade treatments.  Id.  However, Dr. Pace opined that, despite the improvement in Plaintiff's

-22-

condition, he still remained "disabled from his job."   Id.

On March 19, 2003, Plaintiff told Dr. Pace he had been diagnosed as suffering from sleep apnea.   Id. at 538.   Plaintiff also reported to Dr. Pace that he had seen a gastroenterologist, who told him he had elevated iron levels and that he needed a liver biopsy.   Id.   Dr. Pace noted Plaintiff had traveled to Texas to visit his father, who had suffered a stroke.   Id. Plaintiff reported his pain on that date as "six" out of "ten." Id.

Dr. Pace's notes dated March 19, 2003, indicate Plaintiff's psoriatic arthritis was significantly improved by Remicade, although she stated he was still disabled.   Id.   She noted Plaintiff was doing much better on the six-week Remicade infusion therapy.   Id.

On April 23, 2003, Plaintiff rated his pain at "four" out of "ten" and reported a lot of aching in his knees, which occasionally awakened him at night.   Id. at 537.   An MRI of Plaintiff's right knee was unremarkable although it showed some minor changes.   Id.   Plaintiff stated the Duragesic was helping and that "overall his hands and feet are doing better."   Id. Dr. Pace assessed Plaintiff as improving on his current treatment plan and asked him to return in two months.   Id.

Plaintiff saw Dr. Pace again on June 4, 2003, rating his pain at "four" to "five" out of "ten."   Id. at 536. Plaintiff reported his liver biopsy was negative.   Id.   At that time, Plaintiff was taking oxycodone and Duragesic for pain. Id.   The doctor assessed Plaintiff's psoriatic arthritis as stable, with chronic underlying pain, and noted he was taking

Lexapro for depression.   Id.

On July 8, 2003, the ALJ's 2002 decision denying benefits was remanded for further administrative proceedings pursuant to 42 U.S.C. § 405(g), pursuant to the stipulation of the parties.   Id. at 510-13.   The remand order directed the ALJ to

> further evaluate the treating source opinions.  The ALJ will further evaluate the credibility of Plaintiff's subjective complaints and consider lay witness evidence. Finally, the ALJ will obtain vocational expert testimony to determine the effect of any exertional and/or nonexertional limitations established by the record on Plaintiff's occupational base.

Id. at 510.

On July 16, 2003, Plaintiff was seen by Dr. Pace.   Id. at 865.   Her notes state:

> The patient rates his pain as about 7 out of 10.   He states a lot of the pain has returned, and he has noted more pain in his left hip, knees, and hands.  He states he went to see the gastroenterologist who told him he probably had a fatty liver but no specific treatment was given, and he was asked to return to the office in about 6 months.  He was told he could continue with his current medications.  He did have disability paperwork, which I completed today.   I do feel he continues to remain disabled. ... Unfortunately the patient's [psoriatic arthritis] is becoming more active.  He may be developing autoantibodies to Remicade.  We may need to consider a different TNF inhibitor such as Enbrel.  ...

Id.

On August 4, 2003, Plaintiff's wife accompanied him to see Dr. Pace.   Id. at 864.   Ms. Hammond stated Plaintiff was very forgetful and that he was experiencing short-term memory problems.   Id.  Plaintiff reported increased pain and stated the

Remicade was no longer providing as much pain relief.  <u>Id.</u>  Dr. Pace noted that Plaintiff would soon be taking Enbrel, rather than Remicade, for his psoriatic arthritic.  <u>Id.</u>

On September 3, 2003, Plaintiff reported his pain level had improved and stated he was receiving some relief as a result of taking Enbrel.  <u>Id.</u> at 532.  He reported pain in his lower back, but stated his knee pain had improved and that his fatigue had improved.  <u>Id.</u>  At that time, Dr. Pace stated Plaintiff's joints showed no active synovitis and that he had no active psoriatic lesions.  <u>Id.</u>  Plaintiff was then taking Percocet and Duragesic for pain.  <u>Id.</u>

On November 25, 2003, Plaintiff assessed his condition as "fair" and reported more pain due to recent rain.  <u>Id.</u> at 531.  Plaintiff reported his headaches and eye pain worsened when he looked at his computer and stated he was spending "quite a bit of time on the computer."  <u>Id.</u>  Plaintiff had psoriatic patches "which are somewhat worse."  <u>Id.</u>  Dr. Pace recommended Plaintiff reduce his computer use or use a different computer monitor.  <u>Id.</u>[6]

Plaintiff saw a social worker on eight occasions from August 7, 2003 through December 11, 2003, for mental health counseling.  <u>Id.</u> at 579-89, duplicated at 916-26.  The social

---

[6] These were the last treatment notes of Dr. Pace available to the ALJ.  After the unfavorable decision by the ALJ issued in May of 2006, on January 23, 2007, Plaintiff tendered additional treatment notes by Dr. Pace to the Appeals Council, reflecting five office visits by Plaintiff to Dr. Pace in March, May, June and November 2005, and February of 2006.  <u>See</u> R. at 591, 600-04.  Other medical records from the time period after this date were available to the ALJ, i.e., those of examining and reviewing physicians, and Dr. Pace offered an assessment of Plaintiff's residual functional capacity in June of 2005.

worker opined on Plaintiff's mental health on December 27, 2003, and, in a cover letter dated January 12, 2004, regarding Plaintiff's ability to function, but her treatment notes were not attached. Id. at 916. The social worker described Plaintiff's DSM-IV diagnosis as major depression, recurrent, and noted a Global Assessment of Functioning[7] score of 55. Id. The social worker noted Plaintiff experienced "chronic pain which is quite debilitating, client's inability to work affect self-esteem and prognosis is not encouraging." Id. The social worker also noted Plaintiff experienced, *inter alia*, poor memory, sleep disturbances caused by pain, clinical depression, difficulty thinking or concentrating, and decreased energy. Id. at 917. She further recorded "social withdrawal or isolation -- due to physical restrictions." Id. Plaintiff reported "hostility and irritability at times due to pain." Id. The social worker described her clinical findings as "major depression disorder related to his chronic, progressive physical pain," and indicated Plaintiff was not a malingerer. Id. at 918.

A supplemental hearing was held by the ALJ on January 13, 2004, at which the same counsel who now represents Plaintiff appeared on behalf of Plaintiff. See id. at 489-509. Plaintiff testified he was then taking Lexapro for depression and Percocet

---

[7] The GAF is one of the five axes of the diagnostic system described in the Diagnostic and Statistical Manual of Mental Disorders (4th edition), the "DSM-IV", and considers psychological, social, and occupational functioning. A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." DSM-IV at 30. A GAF score of 21-40, on a 100 point scale, indicates multiple symptoms affecting all levels of functioning and a GAF score of 41-70 indicates severe symptoms or serious impairments in social or occupational functioning.

for pain.  Id. at 495-96.  Plaintiff testified his diabetes was controlled, and the transcript of the hearing indicates Plaintiff did not have any apparent hearing difficulties.  Id. Plaintiff testified he had difficulty concentrating and problems with his memory.  Id. at 498-500.  Plaintiff's wife testified his pain was getting worse and that his depression was indicated by a "lack of interest; lack of involvement."  Id. at 502.

Plaintiff's 2001 applications for SSI and disability insurance benefits and his consolidated 2003 application for benefits were again denied in a written decision dated February 10, 2004.

On February 18, 2004, Plaintiff was examined by a licensed psychologist, Dr. Huddleston.  Id. at 927-33 ("Exhibit F6F").  Plaintiff was "unsure regarding the presence of depression, although he reports he has been seeing a counselor and this individual believes he is depressed. ..."  Id. at 927. Plaintiff reported he had trouble sleeping due to pain, and that during the day he would watch television and perform some household duties, such as washing dishes and laundry and light house-keeping.  Id. at 928.  Plaintiff stated he had been taking Lexapro for two years and receiving counseling for six months, and reported "bouts" of depression since 1997.  Id. at 928, 930. "According to Mr. Hammond, his hearing and vision are good." Id. at 928.

Dr. Huddleston performed a formal mental status examination.  Id. at 929.  The doctor noted: "His immediate, short-term and remote memory systems were intact.  ... His concentration was very good."  Id.  Dr. Huddleston diagnosed

-27-

Plaintiff as suffering moderately from a major depressive disorder. Id. at 930. The doctor opined Plaintiff's condition was not severe or debilitating, and that it did not significantly impact his functional capabilities. Id. Dr. Huddleston opined Plaintiff was psychologically capable of performing simple to complex work-related tasks. Id. The doctor concluded Plaintiff's ability to understand, remember, and carry out instructions was not significantly limited. Id.

Dr. Huddleston opined Plaintiff was "quite functional" and that he could respond appropriately to supervision. Id. Dr. Huddleston stated that, although Plaintiff "may suffer a moderately limited (sic) due to depression and pain," he was not significantly limited in his ability to maintain work relations or maintain emotional stability in the work place. Id. The doctor concluded Plaintiff had a fair ability to deal with work stress. Id.

On February 19, 2004, Plaintiff was examined by an osteopathic physician, Dr. O'Brien, at the behest of the Arizona Department of Economic Security Disability Determination Services. Id. at 934-37. Plaintiff stated he was in constant pain and discomfort during the entire examination. Id. at 937. Dr. O'Brien found Plaintiff's range of motion grossly normal on the right and somewhat decreased in Plaintiff's neck and on his left side, particularly with rotation and extension. Id. at 935, 936. A straight leg raising exercise was positive for pain. Id. Plaintiff had good tone bilaterally, but the doctor felt he would not give good effort for strength testing; Dr. O'Brien estimated it to be 5/5 in the extremities except for the

right leg which was 4.5/5.  Id.  There was left shoulder tenderness but normal strength.  Id.  The doctor found no signs of muscle atrophy to quadriceps or calf muscles, either by measurement or visually.  Id.  Plaintiff's gait was within normal limits, with no evidence of ataxia; he was able to walk without assistance and without an obvious limp.  Id.  Notably, the doctor recorded that Plaintiff "was able to stand on heels and toes and perform tandem gait."  Id. at 936.

Specifically, Dr. O'Brien assessed Plaintiff as able to sit less than six hours per day, and opined that lunch and mid-morning and mid-afternoon breaks would provide sufficient relief from sitting.  Id. at 939.  He believed Plaintiff was limited to only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling.  Id.

On March 1, 2004, a State Agency reviewing psychologist, Dr. George, completed a Psychiatric Review Technique Form.  Id. at 948-60.  The psychologist concluded via the Psychiatric Review Technique that Plaintiff had "moderate" restrictions in his activities of daily living and concentration and persistence or pace, and that he had "mild" difficulties in maintaining social functioning, and he had experienced one or two episodes of decompensation.  Id. at 958.

Because the reviewing psychologist concluded that Plaintiff's affective disorder passed the severity threshold of step two of the sequential evaluation, he continued to an assessment of Plaintiff's Mental Residual Functional Capacity. Id. at 948.  With regard to Plaintiff's Mental Residual Functional Capacity, the psychologist rated Plaintiff as "not

-29-

significantly limited" or "no evidence of limitation in this category" in all categories except two, which she rated as "moderately limited." Id. at 944-45. The psychologist opined Plaintiff's ability to maintain attention and concentration for extended periods of time was moderately limited. Id. at 944. Dr. George concluded Plaintiff's ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was also moderately limited. Id. at 945.

On June 10, 2005, Dr. Pace completed a Physical Residual Functional Capacity Questionnaire. Id. at 970-75. Her responses were essentially identical to her responses to the questionnaire at Exhibit 8F.

On October 17, 2005, a social worker completed a "Mental Impairment Questionnaire (RFC & Listings)" indicating she had counseled Plaintiff on August 5 and September 30, 2005. Id. at 976-83. On the basis of those visits, she opined Plaintiff suffered from depression and psychosocial problems, and assessed a GAF score of 45. Id. at 976. The social worker did not complete the portion of the form related to Plaintiff's ability to work, writing "not administered not a psychologist." Id. at 979. She also declined to describe clinical finding which demonstrated the severity of Plaintiff's mental impairment and symptoms because she was not a psychologist. Id. at 977. The clinician opined Plaintiff's prognosis was "fair," and that he did not have reduced intellectual functioning. Id. at 978.

On November 29, 2005, Dr. Narvaiz, a psychiatrist, examined Plaintiff at the behest of the Arizona Department of Economic Security Disability Determination Services. Id. at

-30-

984-89.   The doctor opined Plaintiff suffered from major
depression and a mood disorder secondary to his back pain.   _Id._
at 986.   The doctor believed Plaintiff might have some
difficulty interacting with the public, supervisors and
coworkers, due to his level of pain.   _Id._  Dr. Narvaiz stated
that Plaintiff was, nonetheless, motivated to return to work and
to future management of his pain.   _Id._  Dr. Narvaiz concluded
Plaintiff would benefit from returning to work.   _Id._

Dr. Narvaiz completed a Medical Source Statement of
Ability to Do Work-Related Activities (Mental) indicating
Plaintiff's ability to understand, remember, and carry out short
instructions was slightly limited.   _Id._ at 987-88.   The doctor
indicated Plaintiff's ability to make judgments and interact
appropriately with the public, supervisors, and co-workers was
moderately limited.   _Id._  The doctor stated Plaintiff's ability
to respond appropriately to work pressure was moderately
limited.   _Id._

A hearing was conducted before an ALJ on February 27,
2006.   _Id._ at 1011-49.   Plaintiff was represented by counsel at
the hearing.   _Id._ at 1011.   Plaintiff testified he felt unable
to work because of the pain in his feet, back, knees and left
hand, "[w]ell, and my depression now."   _Id._ at 1018.   Plaintiff
stated he could stand for 15 or 20 minutes before his feet
started to hurt.   _Id._ at 1019.   Plaintiff testified his knees
"just hurt."   _Id._ at 1021.

Plaintiff testified that, when he gets depressed, which
is usually brought on by his pain, he gets frustrated and angry.
_Id._ at 1023-24.   Plaintiff testified he took Lexapro and

-31-

Wellbutrin for his depression.  Id. at 1024.  Plaintiff stated the medications worked, and that he became irritable if he missed taking his medication.  Id.

Plaintiff testified he was taking Percocet and Celebrex for pain, as well as using a Duragesic patch.  Id. at 1025-26. The side effects Plaintiff described included feeling ill, light-headed, and woozy.  Id.  Plaintiff stated he gets the sweats and experiences mood swings.  Id.  Plaintiff testified he had not experienced a flare-up of his psoriasis for over a year, since he had begun taking Humira.  Id. at 1030.

Plaintiff reported difficulty sleeping, for which he took medication.  Id. at 1025, 1031.  Plaintiff testified he tried not to drive when taking his pain pills or when he was wearing his Duragesic patch.  Id. at 1026.  Plaintiff averred that, on an average day he watched television from his recliner, and he testified he had more bad days than good.  Id. at 1032. Plaintiff stated he did not often use his computer and that he took naps.  Id. at 1033.  Plaintiff testified that he was forgetful.  Id.

Plaintiff testified he is left-handed, that his two fingers were fused together, and that his thumb joint is "shot" Id. at 1022-23.  He testified he could not really grasp anything with his left hand, but that he could use his left hand like a hook to hold bags.  Id.  Plaintiff stated he could write a little bit with his left hand.  Id.  Plaintiff testified he could hold his coffee cup in his left hand, sign his name with his left hand, and did minimal typing with his left hand on the computer.  Id. at 1023, 1032.  Plaintiff stated he could lift a

gallon of milk with his left hand.  <u>Id.</u>  Plaintiff also stated he could  cook quick things, but that he had trouble dressing, i.e., he wears pull-over shirts and he leaves his shoes unlaced. <u>Id.</u> at 1027, 1029.

Plaintiff's wife testified her husband's pain was increasing and that it kept them from socializing.  <u>Id.</u> at 1047-48.  Ms. Hammond testified her husband experienced depression and could not concentrate.  <u>Id.</u> at 1048.

A vocational expert (the "VE") testified at the hearing before the ALJ on February 27, 2006.  <u>Id.</u> at 1036-46.  The ALJ established as a given assumption to the VE that Plaintiff could not perform his past relevant work.  <u>Id.</u> at 1036.

The ALJ presented a hypothetical person 42 years old, with a college education, limited to sedentary work.  The ALJ stated the person could do only unskilled work because of depression and  could not crawl, crouch, climb, squat or kneel. The ALJ hypothesized the individual could not use their lower extremities for pushing or pulling, and could not use their upper extremities for above-shoulder work.  <u>Id.</u> at 1036-37.  The ALJ then asked the VE whether there would be jobs available for such a person.  <u>Id.</u> at 1037.  The VE stated there would be jobs, and  identified as one of the jobs telemarketer, which is performed at the unskilled, sedentary level of labor.  <u>Id.</u>

The ALJ asked the VE about the hypothetical person's employability if they missed work on a regular basis and the VE responded that the person might be permitted to miss one day the first month on the job, but not the second or third months, because typically sick leave has not yet accrued.  <u>Id.</u> at 1037.

The VE testified break periods are typically 15 minutes each mid-morning and mid-afternoon, and an hour for lunch.   The VE stated that longer breaks would be problematic for the hypothetical individual, but short bathroom breaks would likely be permitted.   Id. at 1038.

Plaintiff's counsel asked the VE to assume a person with the limitations assessed by Dr. Pace in 2002.   Id. at 1041. Counsel stated the individual's limitations as sitting for 20 minutes and standing for 15 minutes, with an option to sit or stand at will, take unscheduled breaks regularly, lift less than 10 pounds, not use the left hand for any grasping, turning, fine manipulation or reaching overhead, and no stooping or crouching. Assuming such limitations, the VE replied the person could not do the job of telemarketer.   Id. at 1042.

In a written decision issued May 31, 2006, the Administrative Law Judge ("ALJ") concluded Plaintiff was insured for Title II disability insurance benefits through December 31, 2006.   Id. at 614, 623.   The ALJ further determined Plaintiff had not engaged in substantial gainful activity since his alleged date of onset of disability, April 25, 2001.

At Step Two of the evaluation the ALJ concluded Plaintiff's psoriatic arthritis, degenerative arthritis, diabetes, situational depression and fibromyalgia were "severe" conditions but that the conditions were not severe enough to meet or equal any impairment listed in the Social Security

-34-

regulations.  Id. at 615.[8]

The ALJ noted the "long history" of Plaintiff's treatment for psoriatic arthritis.  Id. at 615.  The ALJ noted that, in addition to his surgeries, Plaintiff had been treated with "non-steroidal anti-inflammatory medication, corticosteroids, gold shots and Methotrexate with good results."  Id. at 615.  The ALJ further noted: "The claimant has also been diagnosed with fibromyalgia with secondary depression, asthma and diabetes mellitus[]. He has been treated with anti-depressants and counseling.  There is no evidence of treatment for any medical condition after January 2005."  Id.

The ALJ reviewed the report of Dr. O'Brien of February 20, 2004.  Id.  The ALJ noted Plaintiff had been "able to offer resistance in all extremities.  ... There was some left shoulder tenderness, but strength appeared to be normal. ... His gait was within normal limits and he did not have an obvious limp."  Id. at 616.  With regard to Plaintiff's physical residual functional capacity, the ALJ stated he was "essentially in agreement with Dr. O'Brien's opinions, but finds additional limitations..."  Id.

The ALJ continued:

[T]he claimant does not have an impairment

---

[8] With regard to Plaintiff's allegation of disability based on hearing loss, the ALJ stated:
There is no evidence in the record that the claimant pursued additional evaluation or treatment due to hearing problems... The claimant's wife testified on three separate occasions, but did not indicate that the claimant had difficulty hearing.  Similarly, the claimant testified at three hearings without apparent difficulty hearing. Because there is no evidence that the claimant's [] hearing loss would cause more than a minimal limitation in his ability to perform work related activity, the undersigned finds this impairment non severe.
R. at 616.

-35-

> that meets or equals the criteria of any of
> the listed impairments.  In particular, the
> undersigned notes that the record does not
> document the abnormalities or limitations
> required to meet the requirements of Section
> 1.00 for the musculoskeletal system, ...
> Section 12.00 for mental disorders or
> Section 14.00 for the immune system.  No
> treating or examining physician has
> mentioned findings equivalent in severity to
> the criteria of any listed impairment.  A
> determination must therefore be made as to
> whether the claimant has the residual
> functional capacity to perform the
> requirements of his past relevant work or
> could work in other jobs that exist in
> significant numbers in the national economy.

Id.

The ALJ stated Plaintiff had medically determinable impairments "which in combination may be expected to result in some pain and functional limitations."  Id.  With regard to the severity of Plaintiff's pain, the ALJ further stated:

> [T]he medical history and other evidence in
> the record do not entirely substantiate the
> severity of symptoms alleged by the claimant
> nor the effect the impairments have on the
> claimant's ability to work.  While it is
> likely the claimant does experience a degree
> of limitation the claimant's allegations of
> disabling symptoms are not credible to the
> extent alleged.  In determining whether the
> claimant is able to perform work activities,
> the undersigned has fully considered the
> claimant's allegations of his impairments
> and limitations, Social Security Ruling 96-
> 7p, and the pertinent Regulations.
> Although the claimant has alleged that he
> has a reduced range of activities, as well
> as debilitating pain, the documentary
> evidence nevertheless establishes that the
> claimant has overstated his limitations.
> His statements concerning his impairments
> and the impact upon his ability to work are
> not entirely credible in light of the degree
> of medical treatment required, the reports
> of the treating practitioners, the medical
> history, findings made on examination and
> information reported by the claimant.  It
> should be noted that the undersigned has

-36-

> also considered the testimony of the claimant's wife at the hearing on September 3, 2002, and the statement provided by the claimant's father. ...

Id. at 617.

The ALJ then summarized the testimony of Plaintiff's wife at the hearings conducted September 3, 2002, and January 13, 2004. Id. The ALJ noted her testimony regarding Plaintiff's pain and depressive symptoms. Id. The ALJ also noted the wife's testimony offered February 27, 2006, including the statement that her husband had experienced depression, i.e., he had become withdrawn and did not want to socialize, since January of 2004. Id. The ALJ noted Plaintiff's wife testified "he had no ability to concentrate and that she made him a list of things to take care of during the day and had to call to remind him to make sure that he completed the tasks." Id.

The ALJ then stated:

> The undersigned is unable to conclude that the information provided by the claimant's wife leads to a conclusion that the claimant is more limited than determined in this decision. The claimant's wife has reported that the claimant has experienced significant pain and depression with a reduced activity level. While the claimant may have significantly restricted his activities of daily living, the medical evidence of record does not corroborate the severity of pain and degree of restriction that the claimant has alleged. Similarly, while the claimant has been treated for depression, the record reflects that treatment has been relatively effective in controlling his symptoms. Given the above factors, the undersigned does not find the claimant's wife's statements entirely persuasive.

Id. at 617-18.

The ALJ further noted Plaintiff's allegation that he

-37-

was "unable to engage in all work-related activity since April 25, 2001 primarily due to severe and chronic pain. However, the medical evidence of record does not support the severity of symptoms that the claimant has alleged." Id. at 618. The ALJ noted Plaintiff's symptoms with regard to his psoriatic arthritis had been effectively treated by surgery and medication. Id.

The ALJ continued:

> The claimant alleges that he has experienced severe and debilitating pain, but the level of pain the claimant has alleged appears implausible based on careful review of treatment records. In October 2001, the claimant had morning stiffness for approximately one hour, primarily in the low back and neck []. His hand discomfort was mild and not particularly limiting. The claimant's rheumatologist reported that with the proper degree of autonomy regarding movement, sedentary and light work could likely be accomplished []. ... Diagnostic testing of the back has revealed only mild to moderate degenerative changes in the lower thoracic region []. Examination in May 2002 revealed that the claimant had multiple tender points consistent with fibromyalgia and the claimant began treatment with Remicade []. By July 2002, the claimant reported that his pain level was only a two to three out of ten []. Overall, the record reflects that the claimant has had good results with treatment. Despite being represented by counsel, there is no evidence of treatment for psoriatic arthritis or any other medical condition after January 2005. At that time, the claimant reported to his treating podiatrist that he had been on his feet a lot and had experienced foot pain []. The claimant also stated that a cortisone injection he had received at his last visit had been helpful and he was treated with a second injection and advised to continue with over-the-counter non-steroidal anti-inflammatory medication []. If the claimant had continued to experience severe and disabling pain as he has alleged, it would be reasonable to expect him to seek regular medical treatment and report that pain to treating medical professionals. He has not explained his failure to do so, which

strongly suggests that his pain has not been as severe as he has alleged.

Id.

The ALJ further noted Plaintiff's asthma and diabetes were stable and treated with medication. Id. at 619. With regard to Plaintiff's assertion his depression kept him from working, the ALJ stated:

> In April 2001, the claimant denied having any mood swings or depressive symptoms []. He subsequently began treatment with anti-depressants by his medical doctors and has attended counseling.
> On January 12, 2004, Cherie L. Pray, a clinical social worker reported that the claimant was treated with eight psychotherapy sessions from August 7, 2003 to December 11, 2003 []. He was diagnosed with major depression, recurrent, and psoriatic arthritis which had directly contributed to his emotional distress. She reported that the claimant experienced chronic pain and significant adverse side effects of medication. She concluded that he was unable to be employed []. Ms. Pray also completed a Mental Impairment Questionnaire in which she stated that the claimant was unable to work due to physical restrictions [].
> On October 17, 2005, Jean Young completed a Mental Impairment Questionnaire []. She reported that she has treated the claimant from August 5, 2005 to September 30, 2005 and that he had depression secondary to his medical condition. Ms. Young reported that the claimant experienced sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests feelings of guild/worthlessness (sic), difficulty thinking or concentrating, suicidal ideation in the past, time or place disorientation, social withdrawal or isolation, decreased energy, hostility and irritability. She reported that she was not a psychologist and therefore had no formal testing power.

Id. at 619.

The ALJ determined, after consideration of the

1  statements of Ms. Pray and Ms. Young, that he was

2      unable to assign significant weight to the
   opinions provided for several reasons.  Ms.
3  Pray and Ms. Young are not medical doctors
   or psychologists and therefore their
4  opinions are not entitled to controlling
   weight.  Ms. Pray has offered an opinion
5  regarding the claimant's physical
   limitations which would clearly be outside
6  of her area of expertise.  Moreover, both
   Ms. Pray and Ms. Young saw the claimant over
7  very short time periods and even if the
   claimant had experienced the symptoms
8  reported, there has been no evidence
   presented which indicates that the symptoms
9  or limitations existed for any consecutive
   12 month time period.

10 Id.

11     The ALJ then reviewed the report of Dr. Huddleston

12 dated February 18, 2004.   Id.   The ALJ noted Dr. Huddleston had

13 opined Plaintiff's depression was not

14     severe or debilitating and it did not impact
   significantly on his functional
15 capabilities.  The claimant presented
   clinically as friendly and euthymic, he was
16 intact cognitively and a mental status
   examination yielded normal findings.  Based
17 on the evaluation, Dr. Huddleston concluded
   that the claimant had a fair ability to deal
18 with stress and a good or very good ability
   to perform in all other work-related areas
19 assessed [].

20

21 Id. at 620.  The ALJ then noted Dr. Narvaiz' opinion dated

22 December 12, 2005, that Plaintiff

23     had a slight restriction in his ability to
   understand, remember and carry out short,
24 simple instructions and a slight to moderate
   restriction in his ability to understand and
25 remember detailed instructions.   ... Dr.
   Narvaiz reported that the claimant's mood
26 disorder due to pain may affect his ability
   to interact with others.

27 Id.

28     The ALJ continued: "The claimant has mild limitations

in activities of daily living and moderate limitations in social functioning." Id. The ALJ noted Plaintiff had testified he could cook for himself, wash dishes, help with household tasks, and shop. Id. The ALJ noted this was "consistent with the information provided by his father than (sic) he cooked meals and did some laundry and housecleaning *as he was able*." Id. (emphasis added).

> The claimant has reported to the administration that he is easier to get along with while taking anti-depressant medication []. Consequently, the undersigned finds that the claimant has no more than mild restrictions in activities of daily living and moderate difficulties with social functioning. The claimant has alleged that he has experienced memory problems and difficulty concentrating. The claimant has continued to engage in activities which require the ability to concentrate, such as drive and use a computer []. ...

Id. Noting that Dr. Huddleston had not assessed the same limitations as Dr. Narvaiz, the ALJ concluded: "Giving the claimant the benefit of the doubt, the undersigned finds that the claimant has moderate difficulties in maintaining concentration, persistence and pace. There is no evidence of episodes of decompensation of an extended duration..." Id.

The ALJ noted Plaintiff had been able to travel since his alleged onset date, "suggesting" Plaintiff was not as limited in his activities as he had alleged. Id. at 621. The ALJ noted Plaintiff had reported in April of 2001 that he was pursuing disability benefits although he could probably engage in sedentary or light work. Id. The ALJ noted Plaintiff had reported spending a lot of time on his computer, indicating a residual functional capacity to perform sedentary work. Id. The

ALJ also found it "significant" that Plaintiff had reported to a treating physician that, in January 2005, "he had been on his feet a lot []." Id. The ALJ believed this was "significantly inconsistent with the claimant's testimony that he spent most of his time in a recliner at home and suggests that he exaggerated his symptoms for the purpose of obtaining disability benefits." Id.

The ALJ continued: "As directed by the Appeals Council, the undersigned has carefully considered the opinions provided by the claimant's treating physicians regarding his residual functional capacity." Id. The ALJ then summarizes the treatment notes of Dr. Stone, Dr. Carpenter, and Dr. Pace. Id. With regard to the opinions that Plaintiff could not work at low stress jobs, the ALJ stated:

> The undersigned is unable to assign controlling weight to the doctors' statements for several reasons. The doctors apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, there exist (sic) good reasons for questioning the reliability of the claimant's complaints. The doctors' opinions are without substantial support from the other evidence of record which render them less persuasive.

Id. The ALJ noted the significance of Plaintiff's October 2001 conversation with Dr. Carpenter regarding disability and that Dr. Carpenter reported at that time that Plaintiff could do sedentary or light work if he had a sit/stand option. Id. at 621-22. The ALJ further stated: "In addition, Dr. Pace offered an opinion regarding the claimant's limitations in June 2004, but it appears she last treated the claimant in 2003, so she was relying solely

on the claimant's subjective complaints."   Id. at 622.

The ALJ concluded Plaintiff had the residual functional capacity to perform sedentary work with additional limitations. "The claimant is precluded from crawling, crouching, climbing, squatting and kneeling.   He is unable to use his lower extremities for pushing and pulling or the upper extremities for work above the shoulder level.   He is limited to unskilled work." Id.   The ALJ further determined that, based on the testimony of a vocational expert, given Plaintiffs "residual functional capacity and other vocational factors," that Plaintiff could work as a telemarketer, office helper, or assembler.   Id. at 623.   The ALJ also stated he was "aware of the medical opinions expressed by the reviewing physicians concerning the claimant's residual functional capacity.   While not examining sources, the reviewing physicians of the State agency arrived at a conclusion substantially consistent with the finding herein that the claimant is not disabled."   Id.

**V   Analysis**

Plaintiff summarizes his objections to the ALJ's decision as follows:

> In his decision of May 31, 2006, the ALJ failed to give controlling weight to the multiple opinions of the treating physicians and counselors, and failed to provide a proper analysis for refusing to accept these opinions.  The ALJ incorrectly relied on the opinion of a non-treating source whose opinion was inconsistent with the record and objective medical findings.   The ALJ incorrectly found that Mr. Hammond's impairments do not meet or equal a listing, when the evidence clearly shows that he meets listings 1.02 and 1.03.
> The ALJ found the testimony of Mr. Hammond to be not totally credible with regard to his limitations. The ALJ did not find Mr.

Hammond to be malingering, and therefore, had to set forth clear and convincing reasons for disbelieving him. The ALJ did not set forth such reasons. The ALJ has failed to properly analyze the testimony of Mr. and Mrs. Hammond as required by the Social Security regulations, rulings and case law.

The ALJ failed to meet his burden at step five of the sequential evaluation process by failing to pose a proper hypothetical to the vocational expert testifying at the hearing or to accept the testimony of the vocational expert.

The Remand to the ALJ required him to update the medical record; based on the updated medical evidence, evaluate the treating, examining and non-examining source opinions and provide an appropriate rationale for the weight accorded the opinions and provide clear and specific reasons for any opinion he rejected; evaluate the medical evidence of Mr. Hammond's depression; further evaluate Mr. Hammond's credibility, and consider his wife's testimony, and provide clear and specific reasons for his findings. (TR. 734-734 ) The ALJ failed to follow the Remand mandates. The Record overwhelmingly supports disability, and reversal is the appropriate remedy.

Docket No. 11 at 2-3.

**1. Plaintiff asserts the RFC was incorrect because the ALJ failed to state what weight he gave to the opinions of Dr. Pace, Dr. Stone, and Dr. Carpenter. Plaintiff also asserts the ALJ erred by not considering the opinions of his clinical workers regarding his depression, i.e., Ms. Pray and Ms. Young, as "other sources."**

At Step 4 of the five-step sequential process used to determine if a claimant is "disabled," the ALJ must examine the claimant's "residual functional capacity and the physical and mental demands" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(e) & 416.920(e) (2007). In determining a claimant's residual functional capacity, the ALJ must review and consider all of the medical opinions in the record. Title II's

-44-

implementing regulations distinguish among the opinions of three types of physicians: (1) those who treat the claimant (the "treating" physicians); (2) those who examine but do not treat the claimant (the "examining" physicians); and (3) those who neither examine nor treat the claimant, but who review the claimant's file (the "nonexamining" or "reviewing" physicians). See 20 C.F.R. § 404.1527(d) (2007); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, in determining whether a claimant is disabled, i.e., in assessing a claimant's residual functional capacity, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's. See 20 C.F.R. § 404.1527(d) (2007); Lester, 81 F.3d at 830. Additionally, the Social Security Administration regulations instruct adjudicators to give greater weight to opinions which are explained than to those which are not explained, see 20 C.F.R. § 404.1527(d)(3) (2007), and to the opinions of specialists concerning matters relating to their specialty over those of nonspecialists. See id. § 404.1527(d)(5). See also Holohan, 246 F.3d at 1201-02.

> An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) ... If the treating physician's medical opinion is inconsistent with other substantial evidence in the record, "[t]reating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 CFR § 404.1527." SSR 96-2p.

Holohan, 246 F.3d at 1201-02.

When there is a conflict between the opinions of a treating physician and examining physicians the ALJ may disregard the opinion of the treating physician if he provides specific and legitimate reasons for doing so, which reasons are supported by substantial evidence in the record. Lester, 81 F.3d at 830. The ALJ can meet this burden by "providing a detailed summary of the facts and conflicting clinical evidence, along with a reasoned interpretation thereof." Rodriquez v. Bowen, 876 F.2d 759, 762 (9th Cir. 1989). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000).

> When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given. See id. § 404.1527(d)(4).... the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative.

Snell v. Apfel, 177 F.3d 128, 133 (7th Cir. 1999).

> "[A] treating source's opinion on the issue(s) of the nature and severity of your impairment(s)" will be given "controlling weight" if the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(d)(2).

Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (emphasis added).

-46-

1     The opinion of a claimant's treating physician is not
2   necessarily conclusive as to either the claimant's residual
3   functional capacity or the ultimate issue of disability.  See
4   Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 600
5   (9th Cir. 1999); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.
6   1989).  Opinions of a nonexamining, testifying medical advisor
7   may serve as substantial evidence when they are supported by
8   other evidence in the record and are consistent with it.  Morgan,
9   169 F.3d at 600.

10     The ALJ did not give wrong reasons or no reason for
11  rejecting the residual functional capacity found by Dr. Pace and
12  for rejecting some conclusions in Dr. Carpenter's opinion.  There
13  was substantial evidence in the record to support the ALJ's
14  conclusion regarding Plaintiff's residual functional capacity
15  and, accordingly, any failure to more clearly enunciate what
16  exact weight was given to the opinions of Dr. Pace, Dr. Stone,
17  or Dr. Carpenter, was harmless error, if indeed it was legal
18  error.  The only treating physician who concluded Plaintiff was
19  completely disabled, i.e., that he needed to elevate his legs
20  regularly and that his depression precluded even low-stress work,
21  was Dr. Pace.  The opinion of Dr. Pace, a treating physician, was
22  contradicted the opinions of Dr. Stone and, with the exception
23  of the July 2002 RFC, Dr. Carpenter.  Dr. Stone and Dr. Carpenter
24  were both also treating physicians, and the opinions of examining
25  and reviewing physicians, including two psychiatrists, further
26  supported the RFC assessed by the ALJ.  Additionally, as noted
27  by the ALJ, both Dr. Stone and Dr. Carpenter noted Plaintiff's
28  stress-related disabilities were self-reported, although each

doctor also indicated Plaintiff did not malinger. Dr. Carpenter's only reservations about Plaintiff's ability to function in a work setting despite his pain and depression were based on Plaintiff's representations, not on Dr. Carpenter's clinical observations.

Dr. Pace's opinion finding complete disability and Dr. Carpenter's July 2002 RFC, do not equal "substantial" evidence sufficient to support a finding of complete disability, i.e., a conclusion that Plaintiff was incapable of all sedentary, unskilled labor. See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005); Batson, 359 F.3d at 1195; Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (stating an ALJ need not accept the opinion of a doctor if the opinion is conclusory and inadequately supported by clinical findings). The evidence in the record that Plaintiff was incapable of performing sedentary labor is insubstantial because it is overwhelmingly contradicted by other evidence in the administrative record, i.e., the treatment notes of Dr. Carpenter and Dr. Stone, and the examination reports of Dr. Narvaiz, Dr. Huddleston, and Dr. O'Brien, which do not indicate why Plaintiff would be unable to perform unskilled sedentary labor in a low-stress environment. See Threet, 353 F.3d at 1189.

Accordingly, the ALJ did not commit reversible error in determining that the residual functional capacities assessed by the reviewing and examining physicians, rather than Dr. Pace's or Dr. Carpenter's 2002 assessment, were "consistent with the great weight of the evidence of record." Compare Wilson v.

-48-

Commissioner of Soc. Sec., 378 F.3d 541, 547-48 (6th Cir. 2004).
Dr. Stone's, Huddleston's, O'Brien's, or Narvaiz' opinions, were
sufficient to support the ALJ's decision finding Plaintiff not
disabled because they were each in accordance with independent
substantial evidence in the record, i.e., the functional
limitations assessed by the reviewing physician and the clinical
findings, there was no error in the ALJ's decision. See Morgan,
169 F. 3d at 602; Saelee, 94 F.3d at 522.

        The ALJ gave specific and legitimate reasons, supported
by substantial evidence in the record for rejecting Dr. Pace's
opinion and Dr. Carpenter's July 2002 opinion that Plaintiff was
completely disabled by a condition expecting to last at least one
year. See Saelee, 94 F.3d at 522-23; Tonapetyan, 242 F.3d at
1149 (stating an ALJ need not accept the opinion of a doctor if
the opinion is conclusory and inadequately supported by clinical
findings); Allen v. Heckler, 749 F.2d 577, 579, 580 (9th Cir.
1984) (holding that if the evidence supports more than one
rational interpretation, this Court must uphold the decision of
the ALJ and must not second-guess the ALJ's choice among
conflicting medical opinions). See also Wagner v. Astrue, 499
F.3d 842, 850 (8th Cir. 2007) (concluding an ALJ was entitled to
discount a treating physician's opinion because that opinion was
inconsistent with opinions issued before and after that opinion
by the same doctor). An ALJ may correctly disregard a treating
physician's opinion when it is based upon the claimant's
exaggerated self-reports. See Morgan, 169 F.3d at 602; Sandgathe
v. Chater, 108 F.3d 978, 980 (9th Cir. 1997). It is also
appropriate to discredit a physician's opinion when it lacks

support in the physician's own treatment notes.  See Saelee, 94 F.3d at 522 (holding an ALJ could disregard an examining physician's opinion because "it was obtained solely for the purposes of the administrative hearing, varied from [the physician's] own treatment notes, and was worded ambiguously in an apparent attempt to assist [the claimant] in obtaining social security benefits.").

**The opinions of Ms. Pray and Ms. Young regarding Plaintiff's depression**

The ALJ concluded he was "unable to assign significant weight to the opinions" of both Ms. Pray and Ms. Young."  R. at 619.   This conclusion was not contrary to Social Security regulations which state the opinions of clinicians, which are not "medical source" opinions, are not entitled to controlling weight as to a claimant's residual functional capacity.  See Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (affirming an ALJ could properly reject a social worker therapist's evidence where it was the only testimony contradicting the physicians' testimony that the claimant could work).

With regard to Plaintiff's mental residual functional capacity,

> The Code of Federal Regulations distinguishes between those opinions coming from "acceptable medical sources" and those coming from "other sources." 20 C.F.R. §§ 404.1513(a) and (e), 416.913(a) and (e). From this, 20 C.F.R. §§ 404.1527 and 416.927 each set forth similar guidelines for the Commissioner to follow when weighing conflicting opinions from acceptable medical sources, while containing no specific guidelines for the weighing of opinions from other sources. This permits the Commissioner to accord opinions from other sources less weight than opinions from acceptable medical sources.

Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996).

A social worker, who has not attended medical school nor served a period of residency or internship, is not, pursuant to the Code of Federal Regulations, an "acceptable medical source" of a claimant's mental residual functional capacity. See 20 C.F.R. §§ 404.1513 (2007).[9] See also Hartranft v. Apfel, 181 F.3d 358, 361 (3d Cir. 1999); Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995). A social worker's opinion is an "acceptable source" of medical evidence only if the social worker acts as an agent of a licensed physician or psychologist. See Gomez, 74 F.3d at 970-71.

There is no indication in the record that Ms. Pray and Ms. Young acted as an agent of a licensed physician or psychologist. The opinions of Ms. Pray and Ms. Young were properly classified as other sources whose opinions regarding residual functional capacity are not entitled to controlling weight, pursuant to SSA regulations, regarding Plaintiff's

---

[9]
Other sources. In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section [specifying physicians or psychologists must be licensed], we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to--
(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and
(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).
20 C.F.R. § 404.1513 (2007).

residual mental functional capacity. <u>See</u> 20 C.F.R. §
404.1512(d)(3) (2007); <u>Raney v. Barnhart</u>, 396 F.3d 1007, 1010
(8th Cir. 2005).   With regard to Plaintiff's depression, the
opinions of clinicians who are social workers which are not
supported by evidence of diagnostic testing are outweighed by the
opinions of examining psychiatrists and Plaintiff did not seek
treatment, in the form of counseling, for his depression, but
felt it adequately controlled by medication.

        The undersigned further concludes that any error in the
ALJ's alleged failure to further discuss third-party testimony
was harmless because the Court concludes that no reasonable ALJ,
when fully crediting the testimony, could have reached a
different disability determination.   Each licensed psychologist
who examined Plaintiff concluded that his depression was not so
severe that he could not work.   Neither Ms. Pray's nor Ms.
Young's conclusions were supported by substantial evidence in the
record and the Court concludes the ALJ's ultimate disability
determination did not rest solely on the rejection of this
opinion.   <u>Compare</u> <u>Stout v. Commissioner, Soc. Sec. Admin.</u>, 454
F.3d 1050, 1056 (9th Cir. 2006); <u>Robbins</u>, 466 F.3d at 885
(concluding ALJ's failure to adequately evaluate one third-party
opinion not harmless where the ALJ had only three lay opinions
and the claimant's testimony to consider and the ALJ discussed
the other lay evidence and claimant's testimony).   Furthermore,
as noted by the ALJ, there was no medical evidence in the record
that any of Plaintiff's allegedly disabling symptoms resulting
from his depression lasted for a period of one year.

**Plaintiff further contends the ALJ did not properly analyze his wife's testimony pursuant to Social Security regulations and rulings.**

The ALJ acknowledged Plaintiff's wife's testimony regarding her husband's depression and memory problems, and noted that Plaintiff's wife claimed he had been depressed since January 2004. When assessing a claimant's residual functional capacity, an ALJ must take into account testimony of lay witnesses, such as family members, unless he expressly determines not to "and gives reasons germane to each witness for doing so." Lewis, 236 F.3d at 511. See also Stout, 454 F.3d at 1055-56 (concluding an ALJ must comment on competent lay testimony); Crane, 76 F.3d at 254 (holding an ALJ may reject a third party's testimony upon giving a reason germane to that witness). An ALJ may discount lay witness testimony, *inter alia*, if it conflicts with medical evidence. Lewis, 236 F.3d at 511. Accordingly, the ALJ may, accordingly, take into account a lay witness' testimony to the extent it is consistent with the medical evidence and reject the testimony to the extent it does not comport with the medical evidence.

The ALJ did not silently disregard this testimony. Compare Stout, 454 F.3d at 1055-56. The ALJ's determination of Plaintiff's wife's credibility is supported by the record, because the opinions of Dr. Narvaiz and Dr. Huddleston, and the treatment notes of Dr. Carpenter, Dr. Stone, and Dr. Pace, contradict her testimony that her husband is unable to concentrate and experiences memory loss and depression to the extent he is unable to do even sedentary, unskilled labor. Accordingly, the ALJ's decision in this regard was supported by

substantial evidence and not legal error.  See Bayliss, 427 F.3d at 1218; Lewis, 236 F.3d at 511; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984).

**2. Plaintiff asserts the ALJ improperly discounted his subjective claims of a disabling level of symptoms and did not provide clear and convincing reasons for discounting Plaintiff's symptoms.**

Plaintiff's chief claim to disability was that his pain and depression interfered with his ability to concentrate, i.e., he could not perform even sedentary work in a low-stress environment because he would have to miss work more than four days of work per month.  Plaintiff argues:

> The ALJ performs no analysis, but states conclusions. He finds that Mrs. Hammond's statements are not supported by the record, but provides no citations or examples. He does not address the consistency between Mrs. Hammond's sequestered testimony and that of Mr. Hammond. He does not address the consistency of the statements to those of his father, or the RFCs of the treating or consulting doctors.

Docket No. 11 at 11.

An ALJ must provide "specific, cogent reasons," supported by substantial evidence in the record, for his disbelief of a claimant's statements regarding the claimant's disability.  Lester, 81 F.3d at 834; Bunnell, 947 F.2d at 345.  See also Jernigan v. Sullivan, 948 F.2d 1070, 1073 (8th Cir. 1991).  Unless there is affirmative evidence indicating that the claimant is actually malingering, the ALJ's reasons for rejecting the claimant's testimony must be clear and convincing.  See Lester, 81 F.3d at 834; Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989).  The ALJ must specifically identify what portion of the testimony in the record is credible and what testimony

undermines the claimant's complaints.  See Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). "Where ... the ALJ has made specific findings justifying a decision to disbelieve an allegation ... and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision." Morgan, 169 F.3d at 600.

"To find the claimant not credible the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct, or on internal contradictions in that testimony." Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

> To determine whether the claimant's testimony regarding the severity of [his] symptoms is credible, the ALJ may consider, for example: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  In evaluating the credibility of the symptom testimony, the ALJ must also consider the factors set out in [Social Security Ruling] 88-13.

Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (internal citations omitted).

The absence of supporting medical evidence is relevant to the consideration of a claimant's subjective medical complaints, although it may not provide the only basis for discrediting a claimant's assertions regarding their pain.  See Light, 119 F.3d at 792 ("a finding that the claimant lacks

credibility cannot be premised wholly on a lack of medical support for the severity of his pain"); Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996); 20 C.F.R. § 416.928 (2007) ("Your statements (or those of another person) alone, however, are not enough to establish that there is a physical or mental impairment."). Infrequent treatment is also a basis for discounting a claimant's subjective complaints. Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987).

Plaintiff's case is similar to the reported cases in which the reviewing court held the ALJ's credibility determination was supported by substantial evidence. See Thomas, 278 F.3d 959-60; Morgan, 169 F.3d at 600; Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995); Curry, 925 F.2d at 1130 (finding that the claimant's testimony that "she was able to take care of her personal needs, prepare easy meals, do light housework, and shop for some groceries" was inconsistent with her claimed inability to perform all work activity).

**3. Plaintiff contends the ALJ committed legal error by not following the order remanding the matter to the ALJ.**

The remand order issued by the United States District Court for the District of Arizona on July 7, 2003, directed the ALJ to

> further evaluate the treating source opinions. The ALJ will further evaluate the credibility of Plaintiff's subjective complaints and consider lay witness evidence. Finally, the ALJ will obtain vocational expert testimony to determine the effect of any exertional and/or nonexertional limitations established by the record on Plaintiff's occupational base.

R. at 510. The Court notes the case was remanded pursuant to a

stipulation of the parties, not on a finding by the Court that the record established Plaintiff was entitled to benefits or that the ALJ's prior decision was in error.

An ALJ's failure to follow an order of the District Court upon remand constitutes legal error. See Sullivan v. Hudson, 490 U.S. 877, 886, 109 S. Ct. 2248, 2254-55 (1989) ("Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review ."); Hooper v. Heckler, 752 F.2d 83, 88 (4th Cir. 1985). Such error is harmless unless the failure to follow the order results in prejudice to the claimant. See Garcia v. Barnhart, 188 Fed. App. 760, 766 n.6 (10th Cir. 2006) ("Dr. Hood's records, which the ALJ again failed to address as directed on remand, did state ... a restriction much more consistent with [an opinion not adopted by the ALJ]. It was error for the ALJ to ignore this supporting evidence from Dr. Hood," and not addressing the issue as to whether such error could be harmless).

Plaintiff asserts:

> When this matter was remanded to the ALJ, he was ordered to update the medical record, and based on the updated medical evidence, evaluate the treating, examining and non-examining source opinions and provide an appropriate rationale for the weight accorded the opinions. If he rejects a medical source opinion, was to provide clear and specific reasons for doing so. The ALJ was to evaluate the medical evidence of Mr. Hammond's depression. He was to further evaluate Mr. Hammond's credibility, and consider his wife's testimony. He was to provide clear and specific reasons for his findings. [] The ALJ failed to follow this mandate.

Docket No. 11 at 13.

The Court concludes the ALJ did not fail to follow the remand order.  After reviewing the entire record and thoroughly examining the ALJ's order on remand, the Court has determined that the ALJ did each of the things required by the remand order. Additionally, the Court notes the ALJ is not required to submit a "written evaluation of every piece of testimony and submitted evidence."  <u>Haynes v. Barnhart</u>, 416 F.3d 621, 627 (7th Cir. 2005).  Rather, the ALJ must articulate at some minimal level his analysis of the evidence to ensure the reviewing court that he considered all of the relevant evidence and made the required determinations and, further, to facilitate meaningful appellate review.  <u>See</u>, <u>e.g.</u>, <u>Orlando v. Heckler</u>, 776 F.2d 209, 213 (7th Cir. 1985).

Plaintiff has not demonstrated prejudice arising from any alleged error by the ALJ in this regard.  When an administrative law judge fails to follow a ruling, a plaintiff seeking judicial review must also demonstrate prejudice arising from that error to be entitled to relief.  <u>See</u>, <u>e.g.</u>, <u>Parker v. Barnhart</u>, 431 F. Supp. 2d 665, 672 (E.D. Tex. 2006).  A claimant may demonstrate prejudice by showing that, but for the error, the ALJ might have reached a different conclusion.  <u>Id.</u>  As discussed infra and supra, the ALJ's conclusions regarding Plaintiff's residual functional capacity and his ability to do a range of unskilled sedentary labor were supported by substantial evidence in the record.  <u>See</u> <u>Brawner v. Secretary of Health & Human Servs.</u>, 839 F.2d 432, 434 (9th Cir. 1988) (concluding any error the ALJ committed in classifying the claimant's past work as "light" was harmless where the record supported the ALJ's finding

that the claimant could perform other light work).  Plaintiff's case is distinguishable from those reported cases wherein the federal courts found an ALJ's failure to follow a remand order warranted further remand.  <u>Compare</u> <u>Carrillo v. Heckler</u>, 599 F. Supp. 1164, 1170 (D.C.N.Y. 1984).

Plaintiff's contention that the ALJ erroneously failed to follow the remand order of the District Court by failing to update the medical record does not provide relief.  Although the remand order required the ALJ to, *inter alia*, update the medical record, the order did not shift the burden of producing sufficient evidence of a disability from Plaintiff to the Commissioner.  Plaintiff was informed of and exercised the right to appear and present evidence at the hearing on February 27, 2006.  At the time of the hearing, Plaintiff did not allege any deficiency in the record before the ALJ, at which point the ALJ could continue the hearing.  <u>See</u> 20 C.F.R. § 404.944 (2007). Additionally, as noted by the Appeals Council, the treatment notes of Dr. Pace regarding Plaintiff's visits in March of 2005 through February of 2006 did not establish that Plaintiff was disabled or require the finding of a different residual functional capacity.

**4. Plaintiff asserts the ALJ erred by determining that Plaintiff's impairments did not meet or equal the severity of a listed impairment.**

At the third step of the sequential evaluation used to determine if a claimant is disabled, the ALJ must determine whether the claimant's impairments meet or equal one of the "listed" impairments included in Appendix 1 to the Social Security disability section of the Code of Federal Regulations.

See 20 C.F.R. § 404.1520(d) (2007).

> The List describes the characteristics of each impairment. The description includes the "symptoms, signs and laboratory findings" that make up the characteristics of each listed impairment. 20 C.F.R. § 404.1525. To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his [] claim. To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment...

Tackett, 180 F.3d at 1099 (emphasis in original).

At Step Three of the sequential evaluation it is the claimant's burden to show that his impairments meet or equal one of the listed impairments, including the durational requirement stated in the listing.  See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."); Burch, 400 F.3d at 683, citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989); Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995).  A mere diagnosis of a listed condition does not establish that the claimant meets the listing requirements.  See Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Bernal v. Bowen, 851 F.2d 297, 301 (10th Cir. 1988) ("The mere fact that [claimant] was diagnosed as suffering from major depression does not automatically mean that he is disabled.").  Additionally, "[a] finding of equivalence must be based on medical evidence only." Meraz v. Barnhart, 300 F. Supp. 2d 935, 940 (C.D. Cal. 2004).

"An ALJ must evaluate the relevant evidence before

-60-

concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment" does not meet or equal a listed impairment. <u>Lewis</u>, 236 F.3d at 512. However, the ALJ is not required to state why a claimant fails to satisfy every criteria of the listing if they adequately summarize and evaluate the evidence. <u>Gonzalez v. Sullivan</u>, 914 F.2d 1197, 1200-01 (9th Cir. 1990).

Social Security listings 1.02 and 1.03 state:

1.02 Major dysfunction of a joint(s) (due to any cause):
Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
1. A. Involvement of one major peripheral weight-bearing joint (i.e.,hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; OR
B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.
1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

The ALJ's conclusion that Plaintiff's impairments did not meet or equal the severity of Listings 1.02 or 1.03 is supported by substantial evidence in the record. There is sufficient evidence in the record from which the ALJ could conclude Plaintiff's impairment did not meet or equal Listing

1.02A or 1.03 because there was insufficient evidence in the record to support a conclusion that Plaintiff was unable to ambulate effectively.  <u>See</u> <u>Moncada</u>, 60 F.3d at 523 (holding that, to meet or equal a listed impairment, a claimant's impairments must have every finding in the Listing).  The inability to "ambulate ineffectively" is defined as "an extreme limitation of the ability to walk..."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b)(1); <u>Schultz v. Astrue</u>, 479 F.3d 979, 982 (8th Cir. 2007).   The term encompasses insufficient lower extremity function to permit the claimant's <u>independent</u> ambulation, i.e., without the use of a hand-held device, such as canes, crutches, or a walker, or the ability to walk a block at a reasonable pace on an uneven surfaces, to use standard public transportation, or to carry out routine activities such as shopping.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b)(1).

No doctor opined Plaintiff needed a cane, crutches, or a walker, in order to ambulate.  Plaintiff testified he did not use a cane or other walking device.  Although Plaintiff did require a walker to ambulate after his foot surgery in April 2001, within six months Plaintiff no longer needed the walker. Furthermore, Dr. Pace, Plaintiff's rheumatologist, noted in July of 2002 that Plaintiff did not need an assistive device for occasional walking.  R. at 384.  Dr. Carpenter opined that Plaintiff could walk one city block and did not need an assistive device for walking in July of 2002.  <u>Id.</u> at 403-04.  In November of 2005 Plaintiff told Dr. Pace that when his knee pain got too bad at night he would get up and pace the floor.  <u>Id.</u> at 601. Dr. O'Brien found in February 2004 that Plaintiff's gait was

within normal limits and that he was able to walk without assistance and without an obvious limp. Id. at 936.

Additionally, there was insufficient evidence in the record to support the conclusion Plaintiff's condition met or equaled the requirements of Listing 1.02B because he did not prove he met or equaled the requirement of "inability to perform fine and gross movements effectively" in each upper extremity. The "inability to perform fine and gross movements effectively" involves an "extreme loss of function of both upper extremities that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00B2c. This definitions includes, inter alia, the inability to prepare a simple meal and feed oneself or to take care of personal hygiene. Id.

Meeting or equaling Listing 1.02B requires that both extremities be involved. Although it is undisputed that Plaintiff's left side is dominant and that two of his fingers on his left hand are fused, see R. at 1022-23, the record is devoid of substantial evidence that Plaintiff could not perform fine and gross movements with regard to his right side. Dr. Pace's May 2002 report indicated Plaintiff had pain in his right shoulder, however, the pain improved with medication. Dr. Pace also opined in July of 2002 that Plaintiff was limited in the use of his right arm, but this conclusion was properly rejected because it was unsubstantiated by clinical notes and objective findings and contradicted by other medical evidence. Additionally, the record indicated that, in February 2004, Dr. O'Brien found Plaintiff had some tenderness in his left shoulder only, but that he had normal

-63-

strength, and the doctor did not recommend any limitations on Plaintiff's ability to reach, handle, finger or feel.   See id. at 936, 939.

Plaintiff testified he is able to take care of his personal hygiene and to prepare very simple meals.   Plaintiff testified he is able to dress himself, with limitations, and that he is able to hold a coffee cup in his left hand, use the computer, and "hunt and peck" type with his left hand.   Plaintiff testified he is able to hand-wash some household dishes. Accordingly, Plaintiff's own statements, although not medical evidence, contradict a conclusion that he could not independently initiate, sustain, or complete activities.   Therefore, there was sufficient evidence in the record from which the ALJ could conclude Plaintiff did not meet or equal Listing 1.02 or 1.03 and Plaintiff is not entitled to judgment on this issue.

**5. Whether the ALJ relied on incomplete hypothetical testimony from the vocational expert.**

If it is determined at Step Four that the claimant lacks the residual functional capacity to perform his former job, at Step Five of the sequential evaluation the Social Security Commissioner has the burden of showing that the claimant can perform other jobs which exist in substantial numbers within the economy.   See 20 C.F.R. § 404.1520(f) (2007); Johnson, 60 F.3d at 1432.   In making this determination, ALJ must consider the claimant's age, education, work experience and physical and mental residual functional capacity.   20 C.F.R. § 404.1520(f) (2007).   If the Commissioner identifies appropriate work opportunities which exist in significant numbers, then the

claimant will not be deemed disabled.   <u>See</u> 42 U.S.C.A. § 423(d)(2)(A) (2007).

The Commissioner may carry his burden at Step Five by eliciting the testimony of a vocational expert in response to a hypothetical that sets out all the limitations and restrictions of the claimant regarding their ability to perform work required by employers.   <u>See</u>, <u>e.g.</u>, <u>Cass v. Shalala</u>, 8 F.3d 552, 556 (7th Cir. 1993); <u>Born v. Secretary of Health & Human Serv.</u>, 923 F.2d 1168, 1174 (6th Cir. 1990); <u>Lewis v. Heckler</u>, 808 F.2d 1293, 1298 (8th Cir. 1987).   Although the hypothetical may be based on evidence which is disputed, the assumptions in the hypothetical must be supported by the record.   <u>See</u> <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1043 (9th Cir. 1995).

Plaintiff contends the ALJ failed to meet his burden at Step Five of the sequential evaluation process by failing to pose a proper hypothetical to the vocational expert testifying at the hearing or to accept the testimony of the vocational expert.

An ALJ may rely on a vocational expert's testimony that there are jobs in the economy the claimant may perform when the vocational expert's testimony is based on a residual functional capacity supported by substantial evidence in the record.   <u>See</u> <u>Bayliss</u>, 427 F.3d at 1217; <u>Magallanes</u>, 881 F.2d at 757. Substantial evidence in the record supports the ALJ's determination Plaintiff could do a limited range of light-exertional, low-stress work.   The VE opined Plaintiff could perform jobs which are available in substantial numbers in the national economy and, therefore, the ALJ's decision was not legal error.   <u>See</u> <u>Barker v. Secretary of Health & Human Servs.</u>, 882

F.2d 1474, 1478-80 (9th Cir. 1989).

Plaintiff's assertion that the VE's testimony in response to his counsel's questions indicated he was incapable of employment does not invalidate the ALJ's decision. An ALJ need only accept, and include in his hypothetical to the VE, those limitations the ALJ finds credible and supported by substantial evidence in the record. See Osenbrock v. Apfel, 240 F.3d 1157, 1162 & 1163-64 (9th Cir. 2001) ("Because Mr. Osenbrock did not present any evidence that he suffers from sleep apnea, diabetes, organic brain disorder, or hepatitis in support of his disability claim, the ALJ did not err in failing to include these alleged impairments in the hypothetical question posed to the VE."). The ALJ's findings regarding Plaintiff's residual mental functional capacity were sufficiently stated and supported by substantial evidence in the record. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); Diaz v. Chater, 55 F.3d 300, 307-08 (7th Cir. 1995) ("ALJ need not provide a complete written evaluation of every piece of testimony and evidence"). Compare Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir. 1991). "In order for the testimony of a VE to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations, both physical and mental[,] supported by the record." Thomas, 278 F.3d at 956 (citation and internal quotation marks omitted). An "ALJ is not bound to accept as true the restrictions presented" by the claimant in posing an otherwise legitimate hypothetical question to a vocational expert. See Roberts, 66 F.3d at 184. Additionally, the "exclusion of some of a claimant's subjective complaints in

questions to a vocational expert is not improper if the [ALJ] makes specific findings justifying his decision not to believe the claimant's testimony about claimed impairments such as pain." Copeland v. Bowen, 861 F.2d 536, 540 (9th Cir. 1988). See also Magallanes, 881 F.2d at 756-57; Embrey v. Bowen, 849 F.2d 418, 423 (9th Cir. 1988).

## VI   Conclusion

The record in this matter does not "overwhelmingly" support the conclusion Plaintiff is disabled. Several of Plaintiff's treating physicians opined Plaintiff's physical limitations do not preclude work. Although Dr. Pace, a treating physician, and two social workers opined Plaintiff's pain and depression were severe enough to prevent even low-stress work, several examining psychiatrists opined Plaintiff's pain and depression did not completely preclude Plaintiff from working.

At best, the record is in equipoise regarding the degree to which Plaintiff's pain and depression render him completely unable to work. The substantial medical evidence in the record indicates Plaintiff's physical limitations do not preclude stationary work. The Court concludes there is sufficient relevant evidence in the record as reasonable minds might accept as adequate support for a conclusion Plaintiff is not completely disabled, even if it is possible to rationally draw a contrary conclusion from the evidence and, therefore, the ALJ's conclusion Plaintiff's impairments do not render him completely unable to work should not be reversed. See Orn, 495 F.3d at 630; Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003).

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's cross-motion for summary judgment is **GRANTED**. Judgment shall be entered in favor of Defendant and against Plaintiff with regard to the charges stated in the complaint.

**IT IS FURTHER ORDERED** that, as a result of the Court's determination that judgment in favor of Defendant is appropriate, the Clerk of the Court shall enter judgment accordingly.

DATED this 29th day of January, 2008.

_____
Mark E. Aspey
United States Magistrate Judge

-68-